Mary R. O'Grady, 011434
John S. Bullock, 034950
Allie Karpurk, 037029
OSBORN MALEDON, P.A.
2929 N. Central Avenue, Suite 2000
Phoenix, AZ 85012
(602) 640-9000
mogrady@omlaw.com
jbullock@omlaw.com
akarpurk@omlaw.com

*Attorneys for Defendant Thomas M. Collins, in his official capacity as Executive Director of the Arizona Citizens Clean Elections Commission*

OSBORN MALEDON
ATTORNEYS AT LAW

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| 1Ten LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Thomas M. Collins, in his official capacity as Executive Director of the Arizona Citizens Clean Elections Commission; Mark Kimble; Galen Paton; Sam Crump; Christina Estes-Werther; and Steve Titla, in their official capacities as members of the Arizona Citizens Clean Elections Commission,<br><br>Defendants. | No. CV-26-10652-PHX-DJH<br><br>**DEFENDANT THOMAS M. COLLINS'S PRELIMINARY, LIMITED RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

Consistent with this Court's order (Doc. 4), Defendant Thomas M. Collins, in his official capacity as Executive Director of the Arizona Citizens Clean Elections Commission (the "Executive Director"), submits this preliminary, limited response to Plaintiff 1Ten LLC's ("1Ten") Motion for Preliminary and Permanent Injunction (Doc. 2).

1Ten asks this Court to enjoin a subpoena that does not seek what 1Ten says it seeks, before 1Ten has asked the Executive Director or the Commission to narrow it. The Executive Director is investigating whether a publicly funded candidate, Dr. Ralph Heap, failed to account for roughly $30,000 in campaign signs, considering printing costs alone. Mesa Sign Shop, LLC's ("Mesa Sign") records and testimony show that 1Ten and its owner, Jake Hoffman, ordered those signs, were billed for them, and paid part of the balance. Dr. Heap has sworn that Mr. Hoffman "was neither retained nor paid as a consultant." (Ex. A-9 at 1.) Neither Dr. Heap nor the sign vendor has said who paid, or will pay, for the signs, or with what funds.

The Subpoena principally focuses on who paid, or will pay, for the expense of manufacturing and installing the signs. There are three possibilities: (1) Dr. Heap's campaign paid or expected to reimburse 1Ten; (2) 1Ten paid with its own funds; or (3) someone else paid or agreed to pay. The answer is relevant to whether and the extent to which Dr. Heap violated the law.

This request does not implicate political association, and the Court need not intervene now, for several reasons. The Subpoena seeks records of a commercial transaction, not 1Ten's donors, members, or clients. And if 1Ten believes the Subpoena is too broad, the Commission's rules allow it to ask the Commission to quash or modify it, A.A.C. R2-20-213, and the Executive Director cannot enforce it without applying to superior court, A.R.S. § 12-2212(B). "The possibility that adequate ... corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted). That process can narrow or moot the dispute. 1Ten's claimed harm simply does not exist.

## FACTUAL BACKGROUND

Arizona's Clean Elections program offers candidates public funding in exchange for strict limits on how they raise and spend money. Participating candidates may accept only small individual contributions and may spend only limited amounts of their own money. *See* A.R.S. § 16-941(A). Each swears that they "will comply with" those limits and "will not accept private contributions." A.R.S. § 16-947(B)(3).

Participating candidates must also report "all receipts and disbursements," A.A.C. R2-20-110(A); *see also* A.R.S. § 16-948, and keep records of their campaign contributions and expenses, R2-20-703(A)(2). Violations carry penalties, some measured by the dollar amount at issue. *E.g.*, A.R.S. § 16-942(A) (penalty of "ten times the amount by which the expenditures or contributions exceed the applicable limit"). Where a participating candidate's money comes from, how much is spent, and whether it is reported are thus at the core of the candidate's obligations.

The Commission enforces those requirements and may "require by subpoena the production of any books, papers, records or other items material to the performance of the commission's duties." A.R.S. § 16-956(A)(7), (B)-(C). After a reason-to-believe finding by the Commission, the Executive Director "shall conduct an investigation," using subpoenas and other tools. A.A.C. R2-20-209 to -211. A subpoena recipient may "apply to the Commission to quash or modify" it. A.A.C. R2-20-213(A). After the investigation is complete, the Commission decides whether there is probable cause to believe that a violation occurred, and whether to impose penalties. A.A.C. R2-20-215 to -217. (Ex. A ¶¶ 3-7.)

Dr. Heap ran for the Arizona Corporation Commission as a participating candidate. (Doc. 2-9 at 2 ¶ 1.) He received $147,836 in public funds for the primary election and $221,754 in public funds for the general election. (Ex. A ¶ 3.) In exchange, he agreed not to "accept any contributions" beyond those the Act allows, A.R.S. § 16-941(A)(1), and to "keep and furnish to the Commission all documentation relating to expenditures, receipts, funding, books, records," A.A.C. R2-20-104(C)(6).

In June 2026, a voter filed a complaint reporting "what appear to be hundreds of 4' x 4' campaign signs" for Dr. Heap but could not "determine how the production and installation of these signs are being funded" from his campaign finance reports. (Ex. A ¶ 8; Ex. A-1 at 1.) Dr. Heap responded that Mesa Sign had extended his campaign credit and had not yet invoiced him. (Ex. A ¶ 9); *see* A.R.S. §§ 16-911(B)(6)(d), 16-921(B)(4)(d). On August 14, 2026, the Commission found reason to believe that Dr. Heap violated the Act and "authorized an investigation." (Doc. 2-9 at 2 ¶¶ 6, 10.)

During the investigation, Dr. Heap produced nothing about the April 2026 sign order in response to the Executive Director's request (Ex. A ¶ 12), and stated that he "does not have any communications responsive to this request," (*id.* ¶ 12; Ex. A-3 at 2.) Mesa Sign's owner, Jim Torgeson, swore that he extended Dr. Heap credit because his "professional standing and financial capacity" as "a licensed physician and orthopedic surgeon" made him "a low credit risk." (Ex. A-2, Torgeson Decl. ¶¶ 8-9.) The Executive Director later subpoenaed Mesa Sign for the records supporting Mr. Torgeson's declaration. (Ex. A ¶ 13; Doc. 2-10 at 22.)

Mesa Sign's records, produced under subpoena, show that the signs were not invoiced to Dr. Heap or his campaign, in contrast to Mr. Torgeson's declaration filed by Dr. Heap before the Commission. They were billed to "Jake Hoffman" and "1ten.io" on a single invoice that combined orders for several candidates, with payment "[d]ue on receipt." (Ex. A ¶ 14; Ex. A-5.) Dr. Heap's share was roughly $30,000, and 1Ten paid only part of the invoice balance. (Ex. A ¶ 14.) Mr. Torgeson testified that every communication about Dr. Heap's signs came through Mr. Hoffman or 1Ten (Ex. A-8 at 25:1, 51:6-12), Dr. Heap never discussed quantity, price, or payment with him (*id.* at 56:8-17), and that he does not know how 1Ten's payment was allocated (*id.* at 61:10-18). At Mesa Sign's request, the Executive Director redacted information about other candidates and customers. (Ex. A ¶¶ 15-16.) The Executive Director then shared the redacted records with Dr. Heap and invited him to supplement his response under oath. (*Id.* ¶ 17; Ex. A-7.)

Dr. Heap's sworn supplemental response stated that Mr. Hoffman "was neither retained nor paid as a consultant," and that Dr. Heap "expected any invoices to be issued to the campaign." (Ex. A-9 at 1-2.) It did not say who paid for the signs or with what funds. (Ex. A ¶ 22.)

To determine who paid, or will pay, for Dr. Heap's signs and with what funds, the Executive Director subpoenaed 1Ten. (*Id.* ¶ 23.) The Subpoena informed 1Ten that it could "apply to the Commission to quash or modify" it. (Doc. 2-2 at 5-6); *see* A.A.C. R2-20-213(A). The Executive Director extended that deadline to November 23, and the production deadline to November 25. (Ex. A ¶ 24.) Rather than ask the Commission to narrow the Subpoena or for an additional extension of the time to do so, 1Ten filed this action. The Subpoena is not self-executing. If 1Ten does not comply, the Executive Director may "apply to the superior court" to enforce the Subpoena. A.R.S. § 12-2212(B). The Executive Director will agree to further extensions to allow 1Ten to fully respond to the Subpoena before seeking to enforce it in superior court. (Ex. A ¶ 24.)[1]

The Subpoena makes five requests, all concerning Dr. Heap. (Doc. 2-2 at 3-4.) Request 1 seeks documents showing "each payment made on" the Mesa Sign invoices, "the payor and source of funds for each payment, and whether any portion was applied to the invoice lines for Dr. Heap." (*Id.* at 3.) Request 2 seeks records of pickup, placement, and related costs. (*Id.*) Request 3 seeks documents showing "whether, when, and in what amount Dr. Heap paid or reimbursed 1Ten." (*Id.* at 3-4.) Requests 4 and 5 seek communications "between 1Ten and Dr. Heap" and "between 1Ten and Mesa Sign Shop" relating to his materials and their payment. (*Id.* at 4.) The Subpoena does not ask for 1Ten's donors, members, or clients.

[1] At the parties' court-ordered meet and confer (Doc. 4 at 1-2), the Executive Director offered to (1) withdraw the index instruction; (2) keep information about other individuals confidential and redact unrelated confidential information, with in camera review of any disagreement; and (3) further extend 1Ten's deadlines to December 14 to apply to the Commission and December 30 to produce. (Ex. A ¶ 24.)

## LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). 1Ten "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20.

## ARGUMENT

### I. 1Ten is unlikely to succeed on the merits because the Subpoena seeks records of a commercial transaction, not a political association.

The Executive Director's goal is to complete an investigation into whether Dr. Heap violated the Clean Elections Act and rules, particularly A.R.S. § 16-941(A), which governs permissible transactions for participating candidates. Mesa Sign's invoices indicate that 1Ten and its owner ordered signs and paid part of the balance for signs. (Ex. A-5.) He does not know whether Dr. Heap's campaign paid or will reimburse 1Ten, whether 1Ten paid itself, or whether someone else did. (Ex. A ¶¶ 12, 18-23.) The First Amendment does not bar him from asking 1Ten the answer to that question.

#### A. A vendor's records of who paid for a publicly funded candidate's signs are commercial records, not protected association.

Courts have "uniformly held" that commercial relationships like a vendor's dealings with a campaign "are not protected as associational rights under the First Amendment." *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 46 (D.D.C. 2018); *accord FEC v. Automated Bus. Servs.*, 888 F. Supp. 539, 542 (S.D.N.Y. 1995) (enforcing subpoenas to vendors where they "failed to cite to any law in support of the proposition that a party that vends goods or services to a political association is entitled to similar First Amendment protection" (citation omitted)).

1Ten's dealings with Mesa Sign are commercial in the same way. To complete his investigation, the Executive Director needs to know who paid for Dr. Heap's campaign expenses and with what funds.

Relying on *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174 (2026), 1Ten argues (at 9) that "[w]ho funds campaign speech is donor information." But *First Choice* involved a demand for a nonprofit's "private donor or member information." 608 U.S. at 186. The Subpoena does not ask who supports 1Ten. It asks how a publicly funded candidate's signs were paid for, which he agreed to disclose. (Doc. 2-9 at 2); *see* A.A.C. R2-20-104(C)(6).

1Ten's remaining cases (at 6, 10) fare no better. In *FEC v. Machinists Non-Partisan Pol. League*, the agency sought "every official, employee, staff member and volunteer" of a political committee. 655 F.2d 380, 388 (D.C. Cir. 1981). In *Perry v. Schwarzenegger*, the requests sought a campaign's "private, internal communications regarding formulation of strategy and messages." 591 F.3d 1147, 1165 n.12 (9th Cir. 2010). The Subpoena asks about Dr. Heap's transactions with Mesa Sign, 1Ten, and their payments. (Doc. 2-2 at 3-4.) Nor is the index instruction a demand to list 1Ten's associates; it applies only to responsive records, and, in any case, the Executive Director has offered to withdraw it. (Ex. A ¶ 25; Doc. 2-2 at 5.)

Because the Subpoena seeks records of a commercial transaction, not 1Ten's protected associations, it does not implicate the First Amendment.

**B. 1Ten has not made the required prima facie showing.**

Even if the Subpoena implicated First Amendment interests, 1Ten has not made the prima facie showing of chill with "objective and articulable facts, which go beyond broad allegations or subjective fears." *Mi Familia Vota v. Hobbs*, 343 F.R.D. 71, 83 (D. Ariz. 2022) (citation omitted). "Evidence arguing, rather than factually documenting, an alleged chill" is not enough. *Dole v. Loc. Union 375, Plumbers Int'l Union of Am., AFL-CIO*, 921 F.2d 969, 974 (9th Cir. 1990) (affirming enforcement). Nor are "[a]llegations of a subjective 'chill.'" *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

1Ten offers no declaration from anyone at 1Ten. Its only declarant, James Rogers, is a 1Ten client who did not run as a participating candidate under the Act. (Doc. 2-11 ¶¶ 2-3.) Mr. Rogers says the Subpoena makes him "less willing to speak candidly with

1Ten ... in future campaigns." (*Id.* ¶ 8.) The Subpoena seeks nothing about his signs or communications, and a concern about a hypothetical future subpoena is a "subjective fear[]" that cannot support a prima facie showing. *Dole*, 921 F.2d at 972 (citation omitted). His signs appear on Mesa Sign's invoice only because Mr. Hoffman placed one order for several candidates, and the Executive Director kept that information confidential. (Ex. A ¶¶ 14-17.) It was 1Ten's own motion that identified Mr. Rogers publicly. His concern (*id.* ¶ 10) about the Commission seeing information fails absent a legitimate fear of "retribution by those few governmental employees who would have access to [the] records," *Dole*, 921 F.2d at 974; *accord Bean*, 291 F. Supp. 3d at 45 (rejecting argument "disclosure of its financial records would reveal the identity of its clients, and thus would hinder them from contracting anonymously with Fusion in the future").

1Ten also cites (at 11-12) social-media posts criticizing Mr. Hoffman. But the Executive Director issued the Subpoena because Mesa Sign's records and testimony showed that 1Ten ordered and was billed for Dr. Heap's signs. (Ex. A ¶¶ 18-23.) Any information disclosed regarding 1Ten's other clients will be kept confidential (*id.* ¶ 25), and how Dr. Heap's signs were paid for is information Dr. Heap's campaign had to report, (*see* Doc. 2-9 at 3).

**C. The Subpoena satisfies exacting scrutiny.**

Even if 1Ten had made a prima facie showing, the Subpoena is substantially related and narrowly tailored to a sufficiently important governmental interest. *See Ams. for Prosperity v. Meyer*, ___ F.4th ___, 2026 WL 2934861, at *8 (9th Cir. Sept. 30, 2026). Arizona voters adopted the Act to "improve the integrity of Arizona state government by diminishing the influence of special-interest money." A.R.S. § 16-940(A). Ensuring that publicly funded candidates do not accept prohibited contributions and that all expenditures are properly disclosed is central to that purpose. And the Subpoena is tailored to that interest: it came only after a reason-to-believe finding, seeks records about one candidate's transactions with one vendor, and follows the evidence. Dr. Heap's response did not mention 1Ten, and he has produced no records of the sign order or its payment. (Ex. A

¶¶ 9, 12, 22.) Mr. Torgeson explained that 1Ten placed the order and was billed, but he does not know how Mr. Hoffman's partial payment was allocated or where the money came from. (Ex. A-8 at 51:6-12, 61:10-18.) The Subpoena seeks to fill those gaps.

1Ten argues (at 15) that the Executive Director should rely on what Mesa Sign and Dr. Heap provided. While that information points to 1Ten, it offers no information about the transaction between 1Ten and Dr. Heap. The court in *Automated Bus. Servs.* rejected a similar argument by vendors who claimed the FEC already had the information it sought. *See* 888 F. Supp. at 543 n.4. As that court explained, "[a] person or corporation being investigated cannot be placed in a position of giving only such information as he or it may choose to offer." *Id.* (citation omitted). 1Ten also invokes (at 15) the Supreme Court's warning against "[b]road and sweeping state inquiries." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 610 (2021) (citation omitted). But *Bonta* struck down a blanket requirement that every charity disclose its major donors, noting that the State could instead use a "subpoena" "after initiating an investigation." *Id.* at 613-14. That is exactly what the Executive Director did.[2]

1Ten is unlikely to succeed on the merits.

## II. 1Ten will not suffer irreparable harm absent an injunction.

1Ten must show that "irreparable injury is *likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, and the harm must be immediate and not remediable at final judgment, *NetChoice, LLC v. Skrmetti*, 191 F.4th 452, 463 (6th Cir. 2026). The Executive Director accepts that a colorable First Amendment claim can establish irreparable harm. *Hubbard v. City of San Diego*, 139 F.4th 843, 853 (9th Cir. 2025). But the claim must be colorable as to the demand actually made, and 1Ten's showing falls short for several reasons.

[2] 1Ten argues (at 13-14) that the Subpoena is unlawful because the Commission did not separately vote to subpoena 1Ten. That is a state-law question that cannot support federal injunctive relief. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."). 1Ten could have raised it with the Commission under A.A.C. R2-20-213.

**The harm 1Ten describes does not match what the Subpoena seeks.** 1Ten describes a demand for its donors, associates, and strategy. The Subpoena seeks a targeted set of financial records about one candidate's transactions. It does not ask for the identity of 1Ten's other clients unless one happened to pay for Dr. Heap's signs, and it does not reach communications between 1Ten and its clients that are unrelated to Dr. Heap's transactions. *First Choice* concerned a demand for private donor or member information, not records of commercial transactions. What remains of 1Ten's theory depends on what the Commission might do later, such as issue a broader subpoena. But "[s]peculative injury does not constitute irreparable injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

**1Ten has not shown that it or anyone else will suffer harm.** No one at 1Ten has submitted a declaration, and 1Ten identifies no lost client or changed practice. Its one declarant, Mr. Rogers, describes reluctance to speak candidly in future campaigns. He wants confidentiality in his dealings with 1Ten, yet 1Ten's own public motion identifies him as a client whose signs are on Invoice No. 2947. (Doc. 2 at 9.) The disclosure he fears comes from 1Ten's own filing, not from the Subpoena.

**Nothing is imminent, and 1Ten has not used the process available to it.** 1Ten may ask the Commission to quash or modify the Subpoena, which is also the forum for its argument that the Commission did not authorize it. A.A.C. R2-20-213(A). If the Executive Director later seeks enforcement, 1Ten may raise its defenses in superior court. A.R.S. § 12-2212(B); *cf. Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1177 (9th Cir. 2022). The Executive Director has agreed to extend the deadlines to allow 1Ten to fully respond to the Subpoena, and 1Ten itself disclaims any need for a temporary restraining order. (Doc. 2 at 17.) The Executive Director does not argue that 1Ten had to exhaust administrative remedies before suing. But the question here is equitable. *First Choice* distinguished *Reisman* as a case about "equity practice, not Article III standing," 608 U.S. at 195-96, and in equity "[t]he possibility that adequate ... corrective relief will be

available at a later date ... weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90 (citation omitted).

1Ten has not shown irreparable harm.

**III. The balance of hardships does not favor 1Ten.**

The Executive Director needs to know who paid for Dr. Heap's signs and with what funds, so he can present the full account to the Commission. (Ex. A ¶ 26.) 1Ten faces no compelled disclosure at this time (*id.* ¶ 24), and anything it produces about others will be kept confidential, (*id.* ¶ 25). Its arguments (at 16-17) that an injunction would not harm Defendants assume it will win on the merits. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). 1Ten also ignores that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *accord Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *King*). The hardship of not enforcing the law far outweighs the non-existent or, at best, speculative harm to 1Ten.

**IV. A preliminary injunction would harm the public interest.**

The public interest favors enforcement of the Act's requirements. The injunction 1Ten requests would undermine that purpose by thwarting an investigation into Dr. Heap's campaign spending and reporting.

**CONCLUSION**

The Court should deny the preliminary injunction.

DATED this 24th day of November, 2026.

OSBORN MALEDON, P.A.

By *s/ Mary R. O'Grady*
Mary R. O'Grady
John S. Bullock
Allie Karpurk
2929 N. Central Avenue, Suite 2000
Phoenix, AZ 85012

*Attorneys for Defendant Thomas M. Collins*